75 F.3d 633
 17 ITRD 2313
 B-WEST IMPORTS, INC. and Hing Long Trading Co., Plaintiffs,
and
K-Sports Imports, Inc., Century Arms, Inc., Intrac
Corporation, Northwest Imports, J's Pacific
Enterprise, Inc. and Sportarms of
Florida, Plaintiffs-Appellants,
v.
The UNITED STATES, Warren Christopher, Secretary of State,
Robert E. Rubin, Secretary of the Treasury, George Wiese,
Commissioner of the United States Customs Service, Karen J.
Hiatt, Assistant Commissioner of the United States Customs
Service, Defendants-Appellees.
 No. 95-1326.
 United States Court of Appeals,
Federal Circuit.
 Jan. 25, 1996.
 
 Donald R. Dinan, O'Connor & Hannan, Washington, DC, argued for plaintiffs-appellants. With him on the brief were William W. Nickerson and Craig A. Koenigs.
 Jeffrey M. Telep, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendants-appellees. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Of counsel were Imelda Koett and J. Harold Rees, Bureau of Alcohol, Tobacco & Firearms, Department of Treasury. Also of counsel was Orde Kittrie, Political-Military Affairs, Office of the Legal Advisor, United States Department of State and Ellen McClain, Office of Chief Counsel, United States Customs Service.
 Before NEWMAN, LOURIE, and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 The dispute in this case arises out of a ban on the importation of arms from the People's Republic of China declared by the President and instituted under the Arms Export Control Act (AECA), 22 U.S.C. § 2778. The appellants, companies engaged in the business of importing arms from China, filed suit in the Court of International Trade challenging the ban on statutory, regulatory, and constitutional grounds. The court rejected all of the appellants' claims and dismissed their complaint. B-West Imports, Inc. v. United States, 880 F.Supp. 853 (Ct.Int'l Trade 1995). We affirm.
 
 
 2
 * On May 26, 1994, President Clinton announced the renewal of Most Favored Nation trading status for the People's Republic of China. At the same time, however, in light of "continuing human rights abuses" in China, he announced certain trading sanctions against that country. One of the sanctions was a ban on the importation of munitions from China.
 
 
 3
 China is one of the countries on the State Department's "proscribed list," a list of countries as to which it is "the policy of the United States to deny licenses and other approvals" for the importation of munitions. 27 C.F.R. § 47.52; 22 C.F.R. § 126.1(a). Although China's status on the proscribed list has varied through the years, it has been explicitly listed since 1993 as one of the countries with which the United States maintains an arms embargo. 22 C.F.R. § 126.1(a). Arms may not be imported from any country on the proscribed list, including countries with which the United States maintains an arms embargo, absent a special exception or suspension of the regulation by the Office of Defense Trade Controls in the Department of State. 22 C.F.R. §§ 126.1(a), 126.2, 126.3, 127.1(a)(2).
 
 
 4
 Prior to 1994, China was exempted from the effects of its inclusion on the proscribed list, which meant that for as long as the exemption was in effect, arms could be imported from China by licensed importers who obtained import permits. On May 28, 1994, however, two days after the President announced the arms embargo against China, the Secretary of State advised the Secretary of the Treasury that China's exemption from the proscribed list was terminated "effective immediately on the basis of U.S. foreign policy." In light of the decision to revoke China's exemption from the proscribed list, the Secretary of State requested the Secretary of the Treasury to "take all necessary steps to prohibit the import of all defense articles enumerated in the U.S. Munitions List."
 
 
 5
 The two Treasury Department agencies principally responsible for administering and enforcing arms import regulations--the Bureau of Alcohol, Tobacco and Firearms (BATF) and the Customs Service--thereafter embarked on a series of steps to implement the Chinese arms embargo. Immediately after the President announced the embargo, the Customs Service directed that all shipments of arms from China be detained. Customs subsequently advised its field agents that the embargo was effective as of May 28, 1994, and that all permits for importing arms from China had been rendered null and void. On June 27, 1994, BATF advised companies holding permits to import munitions from China that the embargo became effective on May 28 and that their permits were revoked as of that date. Congress subsequently enacted legislation that ameliorated the effect of the ban by providing that it would not be enforced with respect to shipments that, as of May 26, 1994, were in a bonded warehouse or foreign trade zone, in port, or in transit to the United States. See Pub.L. No. 103-317, § 609, 108 Stat. 1724, 1774 (1994).
 
 
 6
 The appellants challenged the government's actions in the Court of International Trade. They argued that the AECA does not authorize the President or his delegates to impose an arms embargo; that BATF exceeded its authority when it purported to revoke the appellants' permits; that the Customs Service exceeded its authority in detaining goods for which the appellants held validly issued import permits and in declaring the permits null and void; and that the revocation of the permits violated the Due Process and Takings Clauses of the Fifth Amendment to the Constitution.
 
 
 7
 In a comprehensive opinion, the Court of International Trade granted the government's motion for summary judgment, denied the appellants' motion for summary judgment, and dismissed the complaint. The court first found that the AECA authorized the President to order a ban on the importation of arms from China. The statutory grant of authority to "control" arms imports, the court held, encompasses the authority to prohibit such imports altogether in appropriate circumstances.
 
 
 8
 The court also rejected the appellants' argument that the Customs Service and the Bureau of Alcohol, Tobacco and Firearms had acted unlawfully in implementing the arms embargo. Once the President and the Secretary of State made the determination to ban the importation of arms, the court held, BATF was authorized to implement the ban by withholding regulatory approval to import particular arms shipments. That power, the court explained, included the authority to revoke any import permits and licenses of persons seeking to import arms covered by the ban. The court also found that the Customs Service did not act unlawfully by detaining shipments of arms from China following the announcement of the embargo. When China's exemption from the list of proscribed countries was terminated, the importation of arms from China became unlawful, the court explained, and Customs was therefore entitled to rely on its broad general authority to detain goods whose importation is unlawful.
 
 
 9
 Finally, the court rejected the appellants' constitutional claims under the Due Process and Takings Clauses of the Fifth Amendment. The court found that there was no statute or regulation that accorded the appellants a property right to import arms into this country from China. Accordingly, the court concluded that the premise of their due process argument--that property was taken from them without due process of law--was unfounded. Exercising supplemental jurisdiction over the appellants' taking claim, see 28 U.S.C. § 1367(a) (made applicable to the Court of International Trade by 28 U.S.C. § 1585), the court found that the revocation of the appellants' import permits did not effect a taking of their property for which the government must pay compensation. The court held that the statutes and regulations governing the importation of arms made it clear that the right to import arms from overseas is subject to such extensive control that the denial or revocation of an import permit cannot be regarded as a taking of property within the meaning of the Takings Clause.
 
 II
 
 10
 In this court, the appellants renew their argument that the AECA does not authorize an arms embargo. Although section 38 of the Act, 22 U.S.C. § 2778, grants the President the authority to "control" arms imports, the appellants argue that the term "control" limits the President to creating and operating a licensing system for arms importation, and does not allow the President to ban the importation of arms for which import permits have been granted.
 
 
 11
 The appellants' statutory argument is unconvincing. They concede that the term "control" is broad enough to allow the President to ban imports by denying licenses or permits for future imports. Their contention is thus limited to the assertion that "control" does not include the right to revoke licenses and permits after they are granted. But if the term "control" includes the power to prohibit, as the appellants concede it does, we are unable to discern any basis for construing the statute to convey the power to deny permits and licenses in advance, but to withhold the power to revoke them once they have been issued.
 
 
 12
 The appellants have pointed to nothing in the language or the legislative history of the AECA that supports their restrictive interpretation of the statute. The ordinary meaning of the term "control" is to "regulate," to "exercise restraining or directing influence over," or to "curb," Webster's New International Dictionary 580 (2d ed. 1955), and the authority to regulate is normally understood to include the authority to prohibit. Moreover, the appellants' narrow construction of the term "control" is contrary to the principle that statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed. Our predecessor court put that point well in South Puerto Rico Sugar Co. Trading Corp. v. United States, 167 Ct.Cl. 236, 334 F.2d 622, 632 (1964), cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965):
 
 
 13
 In the external sector of the national life, Congress does not ordinarily bind the President's hands so tightly that he cannot respond promptly to changing conditions or the fluctuating demands of foreign policy. Accordingly, when Congress uses far-reaching words in delegating authority to the President in the area of foreign relations, courts must assume, unless there is a specific contrary showing elsewhere in the statute or in the legislative history, that the legislators contemplate that the President may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the Act. In a statute dealing with foreign affairs, a grant to the President which is expansive to the reader's eye should not be hemmed in or "cabined, cribbed, confined" by anxious judicial blinders.
 
 
 14
 As the court noted in South Puerto Rico Sugar Co., Presidents acting under broad statutory grants of authority have "imposed and lifted embargoes, prohibited and allowed exports, suspended and resumed commercial intercourse with foreign countries." 334 F.2d at 633. Thus, the broad statutory delegation in the AECA incorporates "the historical authority of the President in the fields of foreign commerce and of importation into the country." Id. at 634. We therefore agree with the Court of International Trade that the AECA authorizes the President not only to regulate arms importation through a licensing system, but also to prohibit particular importations altogether when the circumstances warrant.
 
 III
 
 15
 The appellants also renew their contention that, even if the AECA authorizes the President to declare an arms embargo, the agencies that implemented the embargo--the Customs Service and BATF--did not act lawfully in this case. Once again, we agree with the Court of International Trade, which held that the agencies did not exceed their lawful authority in putting the embargo into effect.
 
 
 16
 The actions taken by the Secretary of State and the Secretary of the Treasury under the AECA were authorized by Executive Order 11958, which delegates the President's "control" authority under section 38 of the AECA to the Secretary of the Treasury, guided by the views of the Secretary of State on matters affecting the foreign policy of the United States. State Department regulations further provide that "any license or other approval or exemption granted [for arms transactions involving countries on the proscribed list] may be revoked, suspended, or amended without notice whenever ... the Department of State deems such action to be in furtherance of ... the foreign policy of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a). The appellants are therefore incorrect in contending that they were entitled to continue importing munitions from China, pursuant to their previously issued permits, after the embargo became effective. The revocation of their permits was authorized not only by the broad authority granted under the AECA and delegated to the Treasury Department, but also by the regulation that specifically authorizes the revocation, without notice, of permits for importing goods from "proscribed list" countries.
 
 
 17
 The appellants contend that the Customs Service had no lawful right to detain arms shipments from China that were supported by import permits, even after the declaration of the import ban. But a Treasury Department regulation notes that it is "the policy of the United States to deny licenses and other approvals" to import munitions from countries on the proscribed list, including countries "with respect to which the United States maintains an arms embargo." 27 C.F.R. § 47.52. A related regulation, 27 C.F.R. § 47.56(a), provides that officers of the Customs Service are authorized "to take appropriate action to assure compliance with [the Treasury Department regulations] as to the importation or attempted importation of [munitions], whether or not authorized by permit." 27 C.F.R. § 47.56(a). Following the declaration of the Chinese arms embargo and the cancellation of China's exemption from the proscribed list, Customs was therefore authorized to take steps to ensure that goods falling within the scope of the embargo were not admitted into the United States, regardless of whether the goods were supported by an import permit.
 
 
 18
 The appellants make much of the fact that, in a June 7, 1994, directive, the Customs Service advised its field offices that BATF was not processing any applications for permits to import arms from China and that "all current permits to import articles from China are null and void." The appellants argue that Customs has no authority to revoke permits and that its June 7 directive was therefore ultra vires. We do not interpret the June 7 directive as an announcement that Customs had revoked the appellants' permits, but rather as Customs' statement of its view that the permits were effectively voided by the implementation of the embargo, a view that was corroborated when BATF subsequently advised importers that all permits for importing munitions from China were revoked as of May 28, 1994. The June 7 directive therefore did not constitute an administrative action for which Customs had no statutory or regulatory authority.
 
 
 19
 The appellants next challenge BATF's June 27 announcement revoking the importers' outstanding permits for importing arms from China. The appellants contend that BATF's own regulations prohibited it from revoking the importers' permits once they were granted.
 
 
 20
 The BATF regulation that applies generally to permits to import munitions provides that import permits may be revoked without notice at any time. 27 C.F.R. § 47.44(a). While the particular kinds of munitions the appellants were seeking to import are governed by a separate regulation, 27 C.F.R. § 178.112, nothing in that regulation evidences an intention to depart from the rule set forth in the general BATF regulation giving the agency broad authority to revoke arms importation permits.
 
 
 21
 Section 178.112(a) provides that arms of the type at issue in this case may not be imported without BATF's authorization. Although a valid, unrevoked permit constitutes authorization for purposes of section 178.112(a), the regulation does not state or imply that the authorization, once granted, becomes irrevocable. Nor is there any reason to believe that the drafters of the BATF regulations intended to create irrevocable permits for the particular class of munitions covered by section 178, while providing that permits for the general class of munitions covered by section 47.44 could be freely revoked at any time. Moreover, interpreting section 178.112(a) to deny BATF the right to revoke permits after their issuance would be perverse, as it would be contrary to other regulations governing arms imports, which make clear that munitions may be excluded whenever a ban on arms imports is declared for foreign policy reasons, even after the importer has obtained a permit. See 22 C.F.R. § 126.7(a); 27 C.F.R. § 47.56(a). We therefore conclude that after China's exemption from the proscribed list was canceled, BATF was authorized to withdraw its prior approval for the importation of arms from China and to announce to the importers that their permits had been revoked.IV
 
 
 22
 Finally, the appellants challenge the government's actions as violative of the Takings and Due Process Clauses of the Fifth Amendment. In the Legal Tender Cases, 79 U.S. (12 Wall.) 457, 20 L.Ed. 287 (1870), the Supreme Court rejected just such an argument, noting that an embargo would not give rise to a compensable taking or a valid due process claim:
 
 
 23
 A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared.... [W]as it ever imagined this was taking private property without compensation or without due process of law?
 
 
 24
 Id. 79 U.S. (12 Wall.) at 551. While it is true that takings law has changed significantly since 1870, the principles that the Supreme Court articulated in the Legal Tender Cases have remained valid, see Chang v. United States, 859 F.2d 893, 896-98 (Fed.Cir.1988), particularly as they apply to governmental actions in the sphere of foreign relations.
 
 
 25
 For example, in Mitchell Arms, Inc. v. United States, 7 F.3d 212 (Fed.Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994), this court rejected a takings claim virtually identical to the one the appellants have raised here. In Mitchell Arms, BATF revoked the plaintiff's import permits for certain assault rifles, which resulted in the plaintiff's losing the opportunity to sell the arms under an already existing contract. The court held that BATF's revocation of import permits for firearms did not effect a taking. The court noted that the business of importing weapons is "subject to pervasive Government control," and that as a result, "Mitchell's expectation of selling the assault rifles in the United States--which expectation necessarily flowed from the ATF permits--could not be said to be a property right protected under the Fifth Amendment." 7 F.3d at 216. Because "Mitchell's ability to import the rifles and sell them in the United States was at all times entirely subject to the exercise of ATF's regulatory power," Mitchell did not acquire a sufficient interest in the permits to prohibit the government from revoking them without paying compensation. See also Dames & Moore v. Regan, 453 U.S. 654, 674 n. 6, 101 S.Ct. 2972, 2983-84 n. 6, 69 L.Ed.2d 918 (1981) (because of President's "authority to prevent or condition" pre-judgment attachments against Iranian assets, American company "did not acquire any 'property' interest in its attachments of the sort that would support a constitutional claim for compensation" after those attachments were nullified).
 
 
 26
 The same principle is directly applicable here. While an individual who obtains a permit to import arms may make commitments in the arms market on the assumption that the permit will not be revoked before the importation is completed, that assumption does not constitute a "reasonable investment backed expectation[ ]" of the type necessary to support a takings claim. See Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). That is particularly true with respect to importations of arms from a country with which the United States has an arms embargo that is subject to an exemption that could be terminated at any time. See 767 Third Ave. Assocs. v. United States, 48 F.3d 1575, 1581 (Fed.Cir.1995).
 
 
 27
 The appellants' due process claim fares no better. They assert that the implementation of the Chinese arms embargo deprived them of property without due process of law by denying them the opportunity to sell in the United States the munitions for which they had obtained permits prior to the announcement of the embargo. As we have discussed, however, the appellants' right to import and sell Chinese arms in the United States was subject at all times to the hazard that their permits would be revoked, pursuant to statute and regulation, on foreign policy grounds or for other reasons. The Due Process Clause does not require the government to stand as a surety against the adverse consequences sometimes suffered by persons who knowingly undertake that kind of commercial risk.
 
 
 28
 AFFIRMED.