MARITRANS INC., Maritrans General Partner Inc., Maritrans Operating Partners L.P., and Maritrans Capital Corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 96–483 C.

United States Court of Federal Claims.

April 24, 1998.

Laurie A. Frost, Alexandria, VA, and Stephen A. Saltzburg, Washington, DC, for plaintiffs.

Lauren S. Moore, United States Department of Justice, Washington, DC, for defendant.

## OPINION & ORDER

HODGES, Judge.

### I. Introduction

This is a takings case. Plaintiffs allege that 37 of their non-self-propelled tank vessels are effectively "taken" by the Oil Pollution Act of 1990 (OPA 90), Pub.L. No. 101–380 § 4115, 104 Stat. 484.[1] and its implementing regulations. The tankers are being used to transport crude oil and refined petroleum products from port to port in domestic commerce.

The Oil Pollution Act of 1990 requires that all single-hulled vessels be retrofitted with double hulls to continue in operation or be

---

1. *See particularly* 46 U.S.C. § 3703a(a)–(c).

phased out of service according to a retirement schedule that began in January 1995. "The day that OPA 90 took effect, August 18, 1990, it immediately extinguished the greater part of the working life of every single hull tank vessel in the Maritrans' fleet," according to Maritrans. "The future revenue stream was terminated as of a date certain for each vessel ... the moment the statute was enacted into law." The vessels currently owned by Maritrans have varying retirement dates, ranging from the years 2005 to 2015. Maritrans claims that the adverse economic effect of OPA 90 "was felt immediately," however.

Defendant moved to dismiss for failure to state a claim upon which relief could be granted, asserting *inter alia* that plaintiffs did not possess a property right within the meaning of the Fifth Amendment. We denied that motion in April 1997: "Whether an industry is so highly regulated as to deprive its participants of a compensable property interest in maintaining operations is a matter of degree, and perhaps of fact. The U.S. shipping industry may be highly regulated, but we are not prepared to rule that plaintiffs cannot prove a set of facts that would entitle them to relief."

Whether a property right is affected via a regulatory taking is determined by considering the three factors set forth by the Supreme Court in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).[2] We held trial in July 1997 on one of these factors, the impact of the regulation on plaintiffs' reasonable investment-backed expectations. The trial established that at the time plaintiffs built or acquired the vessels[3] identified in

Exhibit B to the complaint, they could not reasonably have anticipated that double hulls would be required during the estimated working lifetime of the vessels. Defendant asked that we address the issue of whether plaintiffs possess a property right protected by the Fifth Amendment.

## II. Background

Plaintiffs own a domestic fleet of barges with an aggregate holding capacity of 4.3 million barrels of oil. Thirty-seven of Maritrans' vessels allegedly are affected by OPA 90. Eleven have been sold or scrapped for salvage as a result of the new regulation. Defendant acknowledges in its motion to dismiss that OPA 90 will have an effect on Maritrans:

> Approximately 90 percent of Maritrans' tank barges are not constructed with double hulls as required by OPA 90 and will be forced out of service, unless they are retrofitted with double hulls, upon each barge's respective retirement date. Approximately sixteen percent of plaintiff's fleet capacity is constructed with double hulls. Approximately ten percent of plaintiff's fleet capacity is constructed with double bottoms but would have to be retrofit with double hulls or retired by 2014.

Plaintiffs contend that they deserve just compensation as a result. Plaintiffs' complaint alleges, in part, that

> The United States, in exercising authority under Section 4115 of OPA 90, has established regulations which effectively prohibit the operation of Plaintiffs' tank vessels on or after their respective retirement dates without double hulls, and has taken the expected useful lives and associ-

---

**2.** The three *Penn Central* factors are the character of the governmental action, the economic impact of the regulation on the claimant, and the interference of the regulation with "distinct" investment-backed expectations. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Later statements of the factors have referred to the last prong as the degree of interference with "reasonable" investment-backed expectations. *See, e.g., Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 645, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993).

**3.** 46 U.S.C. § 2101(39) provides: "The term tank vessel means a vessel that is constructed or

adapted to carry, or that carries, oil or hazardous material in bulk as cargo or cargo residue, and that—

(a) is a vessel of the United States;

(b) operates on the navigable waters of the United States; or

(c) transfers oil or hazardous material in a port or place subject to the jurisdiction of the United States."

*See also* 46 C.F.R. § 30.10–69 (identical definition). 46 C.F.R. § 30.10–65 states that "[t]he term tank barge means a non-self-propelled tank vessel."

ated revenue streams from each such tank vessel since on or about August 18, 1990.

As a result of the passage of Section 4115 of OPA 90, the United States has taken, destroyed, and deprived Plaintiffs of compensable, investment-backed expectations in the working lives of their tank vessels as of the date of enactment of OPA 90, and has taken all economically viable use of Plaintiffs' tank vessels which are not double hulled after their respective retirement dates. Such taking has frustrated and deprived Plaintiffs of its reasonable investment-backed expectations for the continued and prolonged use of such tank vessels.

Plaintiffs argue that the retrofitting requirement is not economically feasible, and that the regulation eliminates all possible alternative markets for these vessels to operate as single hull vessels.[4]

Defendant contends that plaintiffs do not have a property interest for purposes of the Fifth Amendment. Because the maritime industry is pervasively regulated, and because plaintiffs could have anticipated the requirement of double hulls, plaintiffs have no reasonable investment-backed expectations. The hulls of vessels have been subject to regulation and certain types of retrofitting have been demanded in the past, according to defendant.

Much of the present dispute centers around the foreseeability of the requirements of OPA 90. In 1980, Congress enacted legislation aimed at reducing the level of pollution from ocean-going vessels.[5] This legislation gave the Coast Guard some leeway in deciding what regulations would best meet the goal of pollution reduction. As a result of the legislation, the Coast Guard proposed the adoption of a double hull requirement for all vessels. A National Academy of Science study commissioned by the Coast Guard in relation to the proposed rulemaking found that double hulls would be effective in preventing "80 percent of the

casualty related incidents and over 25 percent of the volume of oil spilled due to accidents." On the other hand, the same study concluded that "the retirement of usable single hull tank barges ... would be wasteful and would create unnecessary demands for new capital investment. The financial burden could be of sufficient magnitude to bankrupt some barge operating companies." The Coast Guard withdrew the proposed rule change in 1982.

Congress passed the Oil Pollution Act of 1990 after the March 1989 Exxon Valdez disaster involving a massive oil spill in Prince William Sound, Alaska. The new law provides a phasing-out period for all vessels that are not retrofitted with double hulls. A distinction is made between those vessels that have a single hull and single bottom, and those with a single hull and double bottom. The single hull-single bottom vessels must be upgraded to double hull or be retired by 2010. Double bottom vessels must be upgraded by 2015.

### III. Discussion

■ The "takings" clause of the Fifth Amendment states, "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. A finding that a government action constitutes such a taking reflects a determination that the public at large, rather than a single owner, must bear the burden of an exercise of federal power. *See Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). "The purpose of forbidding uncompensated takings of private property for public use is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). While early takings cases focused on government sei-

---

4. In ruling on a motion to dismiss, the court must "assume all factual allegations to be true and to draw all reasonable inferences in plaintiffs favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995).

5. *See* Act to Prevent Pollution from Ships, Pub.L. No. 96–478, 94 Stat. 2297 (codified as amended at 33 U.S.C. § 1901 *et seq.*).

zures by physical appropriation[6], regulation may also result in a taking if the regulation goes "too far." *See Pennsylvania Coal v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). The Supreme Court "has generally been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action must be deemed a compensable taking." *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (citing *Penn Central,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631). The inquiry is of necessity an "ad hoc, factual" inquiry. *Id.*

■ The Federal Circuit has adopted a two-tiered analysis of takings claims. *See M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995). First, we must determine whether the proscribed activity is a "stick" in plaintiff's bundle of property rights. *Id.* at 1154 (citing *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992)). If so, we consider whether the Government has interfered with the right such that it must pay compensation. *Id.*

■ The Supreme Court has articulated three factors relevant to the second tier of analysis in a regulatory takings case. *See Penn Central Transp. Co. v. City of N.Y.,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The court looks at the character of the governmental action, the economic impact of the regulation on the claimant, and the interference of the regulation with distinct investment backed expectations. *See id.; see also Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir.1994); *Loveladies*

*Harbor, Inc. v. United States,* 28 F.3d 1171, 1176 (Fed.Cir.1994).

Consideration of all three of the *Penn Central* factors is unnecessary if a *per se* rule is applicable. If a regulation deprives an owner of all of the economic value of real property, a taking may be found without reference to the remaining *Penn Central* factors. *See Lucas,* 505 U.S. at 1029, 112 S.Ct. at 2900–01. This rule does not apply if the proscribed property interest was not part of the owner's title to begin with. *Id.* at 1027, 112 S.Ct. at 2899.[7] Additionally, a permanent physical occupation of property may trigger a finding of a taking under the "character of the government action" prong of *Penn Central. See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 434, 441, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982).

At trial we addressed only the third of the *Penn Central* factors—interference of the regulation with distinct investment-backed expectations. The issue that defendant asks us to revisit, however, is whether plaintiffs have a property right within the meaning of the Fifth Amendment.

### Property Rights Within the Fifth Amendment

Defendant argues that we should not reach the three *Penn Central* factors because plaintiffs do not possess property rights cognizable under the Fifth Amendment. In other words, plaintiffs' claim should fail at the "first tier" of inquiry. *See, e.g., M & J Coal,* 47 F.3d at 1153–54. Defendant says that this is so because of the significant degree of regulation present in the maritime industry. The Government also presses a variation of that argument—that the Fifth Amendment does not afford the same level of protection

---

6. *See, e.g., Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S.Ct. 2886, 2892, 120 L.Ed.2d 798 (1992) ("'[p]rior to Justice Holmes's exposition in *Pennsylvania Coal v. Mahon* ... it was generally thought that the Takings Clause reached only a 'direct appropriation' of property ... or the functional equivalent of a 'practical ouster of [the owner's] possession."); *but see id.* ("Justice Holmes recognized in *Mahon,* however, that if the protection against physical appropriations of private property was to be meaningfully enforced, the government's power to redefine the range of interests included in the ownership of property was necessarily con-

strained by constitutional limits. If, instead, the uses of private property were subject to unbridled, uncompensated qualification ... 'the natural tendency of human nature [would be] to extend the qualification more and more until at last all private property disappeared'").

7. The inquiry into limitations inhering in an owner's title is made by referencing state property or nuisance law and federal law. *See Lucas,* 505 U.S. at 1027, 1029, 112 S.Ct. at 2899, 2900–01.

to non-real property that it does to real property. The Government essentially argues that bright-line rules should be applied to bar plaintiffs' claim: Because the industry in which Maritrans participates is highly regulated, plaintiffs have no Fifth Amendment property interest. Because the property at issue is not real property, it does not receive the same level of Constitutional protection afforded to real property.

Such bright-line rules are not applicable to this case. Defendant's "heavy regulation" argument is addressed below first, then defendant's "non-real property" variation of that argument, and finally a recent Federal Circuit case, *Abrahim–Youri v. United States*,[8] that demonstrates why the Government's bright-line tests are not applicable.

### 1. Heavy Regulation

■ Defendant disputes whether plaintiffs "enjoyed a property right protected by the Fifth Amendment" at the time of the alleged taking. It cites a number of cases for the proposition that because of the heavily regulated nature of the industry involved, plaintiffs possessed no such right. In *Mitchell Arms, Inc. v. United States*, for example, a firearms importer entered into a contract with the Federal Directorate of Supply of Yugoslavia to buy assault rifles. *See* 7 F.3d 212, 213 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994). The Bureau of Alcohol, Tobacco and Firearms (ATF) issued permits to Mitchell authorizing importation of the rifles. The import permits were valid for six months. *Id.* at 214. After having imported rifles under the permits during 1987 and 1988, Mitchell renewed four permits in December 1988 authorizing importation of approximately 9,000 assault rifles. ATF announced the suspension of pending applications for import permits in March 1989, but Mitchell was informed by ATF that it could rely on its issued permits. Mitchell then confirmed an order with Yugoslavia for assault rifles that ostensibly would be imported under existing permits expiring in June 1989. Before manufacturing the ri-

fles, the seller required that Mitchell obtain an irrevocable letter of credit to pay for them. On March 21, ATF suspended importation of assault rifles under existing permits to determine whether the firearms met revised criteria for the "sporting purposes exception" of 18 U.S.C. § 925(d). Mitchell received notification of the suspension on March 31, but executed the letter of credit backing its March order with Yugoslavia on April 3. In April and May, the United States Customs Service denied entry of the rifles at Los Angeles and New York for lack of a valid import permit. "ATF refused Mitchell's request that the ban on assault rifles not be extended to weapons for which permits had previously been approved." *Mitchell Arms*, 7 F.3d at 214. The Claims Court dismissed Mitchell's complaint for failure to state a claim upon which relief could be granted, concluding that "neither the permits themselves nor Mitchell's expectations arising from the combination of the permits and its contract with the Directorate amounted to 'a property interest' within the meaning of the Just Compensation Clause of the Fifth Amendment" *Id.* at 215. On appeal, the Federal Circuit noted,

> Mitchell does not contend that either the firearms or the permits constituted the property that was taken. Rather, it argues that its contractual[9] relationship with the Directorate, which it says was entered into in reliance upon the issued permits, gave rise to a reasonable investment-backed expectation protected by the Fifth Amendment. Put another way, Mitchell claims that a property interest was created when it agreed to purchase the assault rifles with an expectation of importing them under the issued permits. Thus, Mitchell asks us to hold that its investment-backed reliance on the issued import permits constituted "property" within the meaning of the Fifth Amendment. We decline to do so.

*Id.*

The Federal Circuit discussed the Claims Court's reliance upon *Bowen v. Public Agen-*

---

**8.** 139 F.3d 1462 (Fed.Cir.1997).

**9.** The Supreme Court has noted that contractual rights may be property for takings purposes. *See, e.g., Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1025,

89 L.Ed.2d 166 (1986) ("[t]his is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation.")

*cies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). Bowen involved a statutory change restricting the State of California's contractual right to withdraw from the Social Security System. The Supreme Court held that the contractual right to withdraw from the system—a system configured originally in the Social Security Act of 1935 to allow states to participate and terminate their participation voluntarily—did not rise to the level of property within the meaning of the Fifth Amendment. *See id.* at 55, 106 S.Ct. at 2398. As the termination provision "was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare," the provision was not property. *Id.*[10] The Federal Circuit in *Mitchell* agreed with the Claims Court that "*Bowen* stands for the proposition that enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Mitchell Arms,* 7 F.3d at 216 (quoting *Mitchell Arms, Inc. v. United States,* 26 Cl.Ct. 1, 5 (1992)). The reason cited by the *Mitchell* court is that "when a citizen voluntarily enters such an area, the citizen cannot be said to possess the 'right to exclude.'" *Id.* (quoting *Hendler v. United States,* 952 F.2d 1364, 1374 (Fed.Cir.1991)).

The *Mitchell* court also relied upon *Allied–General Nuclear Services v. United States. See* 839 F.2d 1572 (Fed.Cir.), *cert. denied,* 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988). In *Allied–General,* the plaintiff claimed a taking by the Government's denial of a permit to operate a plutonium recycling plant. *See Mitchell Arms,* 7 F.3d at 216. Although the Government had "actively pro-

moted and induced the plaintiff's expenditure of over $200 million to build the plant," the Government thereafter "reconsidered its policy regarding nuclear proliferation, refused to issue the expected operating permit, thereby rendering the plaintiff's investment useless." *See id.* at 216. "Just as Allied General's expectation of operating the plutonium recycling plant was found not to be a property right protected by the Fifth Amendment because it was subject to governmental regulation of nuclear facilities, so too Mitchell's expectation of selling its assault rifles in the United States was not such a property right because it was subject to governmental regulation of firearms importation under the Gun Control Act." *Id.* at 217.

Central to the court's analysis in *Mitchell* was the inquiry into whether the interest affected was "totally dependent" upon the Government's regulatory power or "inherent" in the ownership rights of the plaintiff.[11] The *Mitchell* court placed on one side of this divide such cases as *Bowen, Allied–General*[12] (and of course *Mitchell* ), and placed on the other *United Nuclear Corp. v. United States* and *NRG Company v. United States,* two mining cases in which the right to mine was considered as included in title to the land, or "held *independent* of their denied permits." *See Mitchell Arms,* 7 F.3d at 217 (citing *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed.Cir.1990), and *NRG Co. v. United States,* 24 Cl.Ct. 51 (1991)). *Mitchell* focuses on whether the property rights at issue in this case are inherent in the ownership of the vessels and whether they exist independent of the regulatory regime.

Special circumstances were present in *Mitchell Arms, Allied–General,* and *Bowen,* the three cases relied upon most heavily by

---

**10.** The reason for that determination was that the termination provision could not be viewed "as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation." *Bowen,* 477 U.S. at 55, 106 S.Ct. at 2398. When Congress enacted the Social Security Act of 1935, it expressly reserved to itself "[t]he right to alter, amend, or repeal any provision of 'the Act'." *Id.* at 44, 106 S.Ct. at 2392.

**11.** *See Mitchell Arms,* 7 F.3d at 217 ("Mitchell's expectation of selling the assault rifles in domestic commerce—the interest affected in this case— was not inherent in its ownership of the rifles. Rather, it was totally *dependent* upon the import permits issued by the ATF") (emphasis in original).

**12.** In *Allied General,* the Federal Circuit found that the expectation of being awarded a nuclear plant operating license was not a property right protected by the Fifth Amendment.

the Government in the present action. But this case is different from those. This case does not involve "the novelty of nuclear fission" and "the fearsome effect of its use in war" as did *Allied–General. See* 839 F.2d at 1577 (finding that expectation of being awarded an operating license was not a property right protected by the Fifth Amendment). Nor is it an instance such as *Mitchell Arms* in which the governmental action involves the importation of assault rifles "in the sphere of foreign relations." *B–West Imports, Inc. v. United States,* 75 F.3d 633, 638 (Fed.Cir.1996) (discussing *Mitchell Arms* ). It does not involve statutory language serving to disclaim the creation of a contractual right to withdraw from a wholly Government-created entity—the Social Security System. *See Bowen,* 477 U.S. at 54, 106 S.Ct. at 2397–98; *see also Mitchell Arms,* 7 F.3d. at 216 ("*Bowen* rests upon the fact that, when Congress established the Social Security System, it reserved the right to change the System").

These cases may explain why the property rights asserted were dependent upon the regulatory power of the Government; but they do not establish that plaintiffs' property rights, including the right to use its vessels, are not inherent in their ownership. The inquiry is not so simple as examining whether the Government prevents the exercise of a property right by regulating it, transforming the property right into one "totally dependent" on the Government's regulatory regime. That is a tautology; the inquiry is considerably more nuanced.

Many of the cases cited by the Government are distinguishable as national security cases or cases involving particular industries. For example, President Reagan's decision to declare a national emergency and impose economic sanctions on Libya, resulting in the loss of plaintiffs' employment contracts with a Libyan oil corporation, was held not to effect a taking. *See Chang v. United States,* 859 F.2d 893, 898 (Fed.Cir.1988). Even so, the court analyzed the three familiar factors at the second tier of takings analysis. *See id.* at 896–898. Therefore, the case is inconsistent with the Government's theory that

heavy regulation mandates the foreclosure of inquiry at the first tier.

The Government's decision to freeze the processing of plaintiffs' plutonium recycling plant operating license in *Allied–General* was held not to be a taking for national security reasons. *See* 839 F.2d 1572, 1574 ("While every application of nuclear fission is fearsome to many, the possibility that nations, whose slogan is 'death to the United States,' having irresponsible, unprincipled, and bloody-handed dictators, might get nuclear weapons, is pretty near the top of anyone's list of dreads"); *see also United Nuclear Corp.,* 912 F.2d at 1437–38, and *NRG Co. v. United States,* 24 Cl.Ct. at 61 (discussing *Allied–General*'s national security rationale, and finding a compensable taking); *see generally Abrahim–Youri v. United States,* 36 Fed.Cl. 482, 486 (1996), *aff'd,* 139 F.3d 1462 (Fed.Cir.1997) ("those who engage in international commerce do so in full awareness that the security of their enterprise is uniquely dependent on the maintenance of stability and good order in the relationships of the nations involved.... Since the observance of good order among nations can never be taken for granted, the potential for Government involvement in international commerce remains an ever-present fact of life for those who transact their business abroad"). The *United Nuclear* decision rejected the Claims Court's determination based on *Allied–General* that the Secretary of Interior's refusal to approve a mining plan necessary to perform under a lease was not a compensable taking. The Federal Circuit concluded that a taking had occurred. In reversing the Claims Court's decision, the court stated that the situation before it did not involve "concern over national safety." *United Nuclear,* 912 F.2d at 1438; *accord NRG Co.,* 24 Cl.Ct. at 61, 64 (cancellation of permits granting plaintiffs the right to obtain a mining lease determined to be a taking).

Courts have been reluctant to find a taking involving certain spheres of activity. For example, the Supreme Court has made clear the difficulty of recovering under a takings theory in the ERISA arena. *See Concrete Pipe and Prods. of California, Inc. v. Construction Laborers Pension Trust for South-*

*ern California,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Connolly,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). The plaintiff in *Concrete Pipe* claimed that the imposition of withdrawal liability under ERISA for withdrawing from a multiemployer pension trust fund was a taking. *Id.* at 605, 113 S.Ct. at 2270–71. The Supreme Court disagreed. It determined that although ERISA's original limitation of contingent liability for a participating employer was 30%, plaintiff had no reasonable basis to expect that the legislative ceiling would never be lifted. *Concrete Pipe,* 508 U.S. at 604, 113 S.Ct. at 2270 (analyzing the reasonable investment-backed expectations prong of the *Penn Central* test). The court also noted under the nature of the governmental action prong that Concrete Pipe voluntarily chose to participate in the [Construction Laborers Pension Trust for Southern California] Plan. *Id.* at 645, 113 S.Ct. at 2291. A similar result obtained in *Connolly.* The Court stated, under its reasonable investment-backed expectations inquiry, that "when it became evident that ERISA fell short of achieving this end [of imposing withdrawal liability], Congress adopted the 1980 amendments. Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations." *Connolly,* 475 U.S. at 227–28, 106 S.Ct. at 1027.

*Connolly* and *Concrete Pipe* do not support the Government's theory that the regulated nature of the industry precludes a cognizable Fifth Amendment property interest; *i.e.,* that plaintiffs' claim should fail at the first tier of the inquiry mentioned by *M & J Coal.* The Supreme Court could have established such a rule. Instead, the Court in both cases analyzed the three familiar *Penn Central* factors, including an evaluation of the reasonableness of the plaintiffs' investment-backed expectations. These cases do not establish a blanket rule, even with respect to distinct investment-backed expectations. *See, e.g., Concrete Pipe,* 508 U.S. at 649, 113 S.Ct. at 2293 ("I also note that the Court's opinion should not be read to imply that employers may be subjected to retroactive withdrawal liability simply because 'pen-

sion plans [have] long been subject to federal regulation'") (O'Connor, J., concurring); *Connolly,* 475 U.S. at 228, 106 S.Ct. at 1027–28 ("The Court ... has no occasion to decide whether the MPPAA may violate the Taking Clause as applied in particular cases ...") (O'Connor, J., concurring).

The Federal Circuit has recognized that the highly regulated nature of the banking industry imposes significant obstacles to a successful takings claim, as applied to insolvent or failing financial institutions. *See, e.g., Branch v. United States,* 69 F.3d 1571 (Fed.Cir.1995), *cert. denied,* — U.S. —, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996); *Golden Pacific Bancorp. v. United States,* 15 F.3d 1066, 1073–74 (Fed.Cir.), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *see also California Housing Securities, Inc. v. United States,* 959 F.2d 955 (Fed.Cir.), *cert. denied,* 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992). But many cases involving regulated industries at least examine the three *Penn Central* factors. *See, e.g., Ruckelshaus,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (taking claim based upon a federal statute's forcing of disclosure of plaintiff's trade secrets); *Chang,* 859 F.2d at 898. We cannot find support for the proposition that the mere presence of regulation precludes analysis of the three familiar *Penn Central* factors at the second tier of analysis mentioned by *M & J Coal.*

Establishing a taking claim in certain spheres of activity may be difficult. But we are not aware of a blanket no-takings rule with respect to regulated industries; or that one may never prevail on a takings claim if participating in a heavily regulated industry. Certainly we cannot accept the Government's argument that because the industry in which Maritrans participates is regulated, we should end the inquiry at the first tier of analysis. The Government's argument in this respect is without merit.

2. Real Property vs. Other Property

Defendant argues that personal property has traditionally been afforded less Fifth Amendment protection than real property. The Supreme Court recognized such a possibility in *Lucas* by noting that "in the

case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [an owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Id.* at 1028, 112 S.Ct. at 2899–2900 (citing *Andrus v. Allard,* 444 U.S. 51, 66–67, 100 S.Ct. 318, 327–28, 62 L.Ed.2d 210 (1979) (prohibiting the sale of eagle feathers)). On the other hand, the question of whether the right of use—the "stick" in plaintiff's bundle of rights of most concern here—falls within the "range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments," [13] could likely be answered in the same manner as *Lucas* instructed.[14] The range of interests protected is defined by resorting to "existing rules or understandings that stem from an independent source such as state law." *Lucas,* 505 U.S. at 1030, 112 S.Ct. at 2901. Thus, while it is "unexceptional" when the Takings Clause does not require compensation for prohibiting uses already proscribed by "existing rules or understandings," when "a regulation that declares 'off-limits' all economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate, compensation must be paid to sustain it." *Id.* If this principle applies to property other than real property, plaintiff may be due compensation.[15]

*Mitchell* focuses our attention on whether the rights at stake, such as the right of use,

are inherent in ownership and the extent to which those rights exist independently of the Government's regulatory regime. *Lucas* directs the court to determine whether the rights at stake fall within the range of interests that qualify for protection as "property" by examining relevant "background principles." We view our task under *Lucas* as quite similar to that of *Mitchell Arms.* This is so because of the *Lucas* decision's acknowledgment of government's "traditionally high degree of control over commercial dealings" involving personal property. *Lucas,* 505 U.S. at 1027–28, 112 S.Ct. at 2899–2900. In other words, non-real property may be viewed differently from real property not so much because it is not real property, but because traditionally it is more highly regulated. The Government's argument concerning personal property is only a variation of the Government's "heavy regulation" argument.

Plaintiff concedes that shipping is a regulated industry. Some of the current regulatory framework was in place before Maritrans acquired the vessels at issue. The extent of regulation at the time of acquisition is not entirely dispositive, however.[16] It does not inform us whether the right of use at stake in this case, for example, is dependent upon a government regulatory scheme, as in *Mitchell Arms,* or whether an independent or preexisting right of use under common law applies.[17]

Defendant points out that plaintiffs' right to operate their vessels as tank barges to carry oil or hazardous substances is condi-

---

13. *Lucas,* 505 U.S. at 1030, 112 S.Ct. at 2901.

14. The application of the *Lucas* test to personal property in no way contravenes the Supreme Court's statement about the highly regulated character of such property. The court's observation merely underscores that in many cases involving personal property, background principles may dictate that compensation should not be expected.

15. At least one Federal Court of Appeals has determined that the *per se* takings doctrine applies both to real and to personal property. *See Nixon v. United States,* 978 F.2d 1269 (D.C.Cir. 1992).

16. Such a backdrop *could* be dispositive if it demonstrated that a plaintiff's investment-backed expectations were not reasonable or that proper-

ty rights do not inhere at all in the examined industry or field.

17. The Supreme Court has recognized that if vessels are requisitioned by the Government for war-related purposes, the Government has the obligation to pay just compensation. *See, e.g., United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 70 S.Ct. 217, 94 L.Ed. 195 (1949); *United States v. Cors,* 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949). Additionally, the "extinguishment" of a materialman's lien on a vessel constitutes a taking. *See Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). It is clear that many of the characteristics of property "inhere" in the ownership of vessels.

tional upon their ability to obtain a [Certificate of Inspection] from the Coast Guard, which will be issued only if the vessels comply with United States' laws and regulations. These considerations are relevant, but they do not establish a common law prohibition against exercising the rights at stake, including using the vessels.

The mere operation of tank vessels or tank barges is not a nuisance. Common law would not block the use of such vessels on nuisance grounds. The fact that defendant can catalogue statutes and regulations applicable to the shipping industry does not dispose of our inquiry. The statutes listed by defendant date to the 1800s, but no common law prohibitions are cited. Defendant does not address the rights that may attach to ownership of vessels and that exist independently of the Government's regulatory framework.

All of the regulations offered by defendant do little more than establish that the shipping industry has been regulated for a long time. Inherent in the ownership of vessels is the right to use them.[18] As the *Lucas* court stated, "the fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common law prohibition." *Lucas*, 505 U.S. at 1031, 112 S.Ct. at 2901.

The comment in *Lucas* concerning personal property[19] is dictum, and not dispositive in any event. It may be more difficult to assert a claim in the personal property context, but it is not impossible under current case law. In *B–West Imports, Inc.*, a post-*Lucas* case, the Federal Circuit chose not to rely on a real property/non-real property distinction, but relied instead on a principle dating to the 1870 *Legal Tender Cases*. *See B–West Imports*, 75 F.3d at 638 (involving the revocation of permits to import and sell arms from

China) (citing *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 20 L.Ed. 287 (1870)). The court noted that the principles applicable to the *Legal Tender Cases*, including the notion that "an embargo would not give rise to a compensable taking or a valid due process claim," were still valid, "particularly as they apply to governmental actions in the sphere of foreign relations." *B–West Imports, Inc.*, 75 F.3d at 638. The court also noted that the case before it was "virtually identical" to *Mitchell Arms*. *Id.* Although the case was virtually identical to *Mitchell Arms*, the court based its decision on a more limited rationale, and tempered its language markedly from the broad pronouncements issued in *Mitchell Arms* relating to "pervasive Government control." Instead of the plaintiff's being barred from recovery in *B–West Imports, Inc.* on the basis of a real property/non-real property distinction or a blanket "heavy regulation" rule, the plaintiff could not recover because it participated in an industry affected by government action in the sphere of foreign relations. The Federal Circuit could have adopted a blanket rule based on a "non-real property" or heavy regulation rationale in that case and in others. Instead, it decided the case on an *ad hoc*, fact-specific basis as directed by the Supreme Court.

### 3. Abrahim–Youri

*Abrahim–Youri v. United States* shows that we cannot be limited to the Government's heavy regulation test or its personal property test. We cannot end the inquiry at the first tier of analysis suggested by *M & J Coal. Abrahim–Youri* involved claims of United States nationals against Iran resulting from the 1979 seizure of the American Embassy in Tehran. *See* 36 Fed.Cl. 482 (1996), *aff'd*, 139 F.3d 1462 (Fed.Cir.1997). Subsequent executive orders signed by Pres-

---

**18.** The right of use has been described as one of the "classical property rights." *Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 286 (4th Cir.1998) (citing *Loretto*, 458 U.S. at 435, 102 S.Ct. at 3175–76 (property rights include "the rights to possess, use and dispose of [a thing]" (internal quotation marks and citation omitted))); *see also Penn Central*, 438 U.S. at 127, 98 S.Ct. at 2660–61 (a use restriction may constitute a taking).

**19.** That is, "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Lucas*, 505 U.S. at 1028, 112 S.Ct. at 2899–2900.

ident Carter blocked transfers of property of Iran, effectively freezing billions of dollars of American-controlled Iranian assets. The "Algiers Accords" between the United States and Iran in 1981 providing for the release of the hostages and the return of assets to Iran, also established the Iran–United States Claims Tribunal to resolve certain outstanding claims. The Government agreed to "espouse" its citizens' claims against Iran on their behalf. *Abrahim–Youri*, 139 F.3d at 1464–65.

The Government settled the small claims of the U.S. nationals with Iran in advance of the claims being referred to the Foreign Claims Settlement Commission. The Government allocated $50 million for payment of the small claims. The Commission ultimately entered awards valued at $41,570,936 in principal and $44,984,859 in interest. As it turned out, therefore, "the $50 million allocated for the small claims (together with the interest borne on that sum) was insufficient to pay the successful claimants the full amount of their interest awards." *Id.* The plaintiffs claimed that the United States' espousal and settlement of their claims was a taking.

The Court of Federal Claims found no taking, applying the three-factor *Penn Central* test. On appeal, the Federal Circuit affirmed the no-taking finding. The plaintiffs argued to the Federal Circuit that the *Penn Central* factors were inappropriately applied by the trial court, and urged that the Government effected a *per se* taking. While the Federal Circuit rejected this argument, the Court of Appeals did not apply a real property/non-real property rule, and it did not apply a blanket "heavy regulation" rule:

In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme court stated that the range of interests that qualify for protection as "property" under the Fifth Amendment are defined by existing rules or understandings that stem from an independent source such as state law. *Id.* at 1030, 112 S.Ct. at 2901. In that case the Court was considering the extent to which a regulatory imposition could prohibit development of the plaintiff's real

estate. The Court held that background principles, there the state's basic nuisance law, defined the scope of the property right; if the reach of the regulation was coincident with the scope of the state's power to control nuisances, a power that inhered in all land titles, then no compensation would be due. *Id.*

By like token, it does not strain *Lucas* beyond its intended purpose to recognize that a similar principle may apply to "property" that arises through consensual international transactions as it does to property interests created by domestic law. Certain sticks in the bundle of rights that are property are subject to constraint by government, as part of the bargain through which the citizen otherwise has the benefit of government enforcement of property rights. As the trial court correctly observed, those who engage in international commerce must be aware that international relations sometimes become strained, and that governments engage in a variety of activities designed to maintain a degree of international amity.

*Abrahim–Youri*, 139 F.3d at 1467–68. The Federal Circuit could have applied a blanket rule relating to heavy regulation, but did not. The fact that the rights at issue were "choses in action" and not real property did not receive particular scrutiny by the court either. Instead, the court mentioned that "background principles" could be examined in the non-real property context as well as the real property context, then determined that the international security aspects of the case were significant: "Nor have [plaintiffs] shown that those engaged in international transactions with Iran could not have anticipated the need for government intervention. A history of such interventions can be seen in [prior cases]." The court did not establish a bright-line rule. As Judge Clevenger noted in concurrence, "there may be instances in which the governmental interests in espousal are so weak, or otherwise in question, that an espoused plaintiff may successfully show ... entitlement to compensation." *Abrahim–Youri*, 139 F.3d at 1469.

A bright line "heavy regulation" test to determine whether compensable property

rights exist would be simple enough. But such a result would not be consistent with *Mahon* and *Lucas*. Regulations affect practically every industry, but each industry is different from another. The "background principles" relevant in one industry will not be the same as in others. This is the importance of case-by-case inquiry.

## IV. Conclusion

Plaintiffs have a Fifth Amendment property interest in their vessels. Mere participation in a regulated industry does not preclude a finding that a compensable taking has occurred. We propose to resolve the issues of economic impact and character of the government action on an expedited basis. Counsel will submit a stipulated schedule to the court within ten days.