Ricardo J. PAGE and Paul E. Fenske, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 99–441 C.

United States Court of Federal Claims.

Dec. 28, 2001.

---

Ricardo J. Page and Paul E. Fenske, Maywood, IL, pro se.

John C. Einstman, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Harold D. Lester, Jr., Assistant Director, Department of Justice, Washington, DC, for defendant. James D. Holt, Department of Agriculture, of counsel.

### OPINION AND ORDER

HEWITT, Judge.

I. Procedural History

This is a takings claim brought by pro se operators of an ostrich quarantine station. Plaintiffs, Ricardo J. Page and Paul E. Fenske, allege that a 1994 regulatory change pertaining to quarantine facilities for birds effected a "permanent and substantial interference with [their] leasehold and business" amounting to an unconstitutional taking without just compensation. Complaint (Compl.) ¶¶ VI, X. Defendant, acting through the United States Department of Agriculture Animal and Plant Health Inspection Services (APHIS or the agency), moved to dismiss or, alternatively, for summary judgment.

While considering defendant's motion, the court observed that plaintiffs might not be

permitted under the rules to maintain this action in their individual capacities and unrepresented by counsel because plaintiffs signed the lease to operate their ostrich quarantine facility (the "Lease") as officers of the corporate entity, Star International Ostrich, Inc. (Star). *See Page v. United States,* 49 Fed.Cl. 521, 531 (2001). Following a status conference with the parties on January 5, 2001 to address whether Messrs. Page and Fenske were the proper parties to bring this takings action, the court directed plaintiffs to "inform[ ] the court whether Star International Ostrich, Inc. has any interest in plaintiffs' claim in this matter and [to] provide[ ] the court with copies of the documents, certified as true and correct, on which plaintiffs rely." Order dated January 8, 2001. During the status conference, plaintiffs stated that they were aware of documentation "that ... puts all the liability from the lease to us [Messrs. Page and Fenske], and away from our real estate part of it. ... I just don't remember how it—but it was done. ... I'll get the stuff." Transcript of January 5, 2001 Status Conference at 22.

In response, plaintiffs filed an Affirmation dated February 5, 2001 (Plaintiff's Affirmation of February 2001). That affirmation, which was filed by leave of court on February 13, 2001, stated that Star International Ostrich Inc. settled a 1995 lawsuit filed by its landlord Petelle Industrial Real Estate by paying money for a dismissal. *See* Plaintiffs' Affirmation of February 2001. The affirmation further stated that "[t]he Corporation then assigned all of its assets to us for this payment ... [and Messrs. Page and Fenske] are still the owners of the assets of the Corporation which consisted mainly of the [pending takings] claim." *Id.*

By Order dated February 13, 2001, this court directed plaintiffs to file with the Clerk of the Court on or before February 21, 2001 copies of the settlement document and asset assignment to which plaintiffs referred in Plaintiffs' Affirmation of February 2001. On March 26, 2001, plaintiffs responded to the court's order to produce evidence of the assignment by filing a brief arguing that Star did not exist as a corporate entity at the time plaintiffs executed the Lease.

After full briefing of that issue, the court found that Messrs. Page and Fenske were not the proper parties in interest to prosecute this action under Rule 17(a) of the Court of Federal Claims (RCFC). *Page,* 49 Fed.Cl. at 523–24. The court ordered, by Opinion and Order dated June 8, 2001, that the named parties substitute Star as plaintiff in this action and obtain counsel. *Id.* at 531.

In response to the court's order to substitute Star as plaintiff and further to a status conference arranged by the court to discuss further proceedings with the parties on September 4, 2001,[1] plaintiffs filed with the Clerk of the Court, on September 20, 2001, a copy of a document titled "Assignment and Assumption Agreement" dated March 8, 1994 (Assignment) whereby Messrs. Page and Fenske assumed certain "rights, beneficial interests, holdings, assets, and liabilities" listed in an exhibit. The first item listed in the exhibit is the Lease. *See* Amendment to the Amendment of 4–12–2001, to Plaintiffs' Reply to the Defendents' [sic] Reply of February 21, 2001, Response Regarding Star International Ostrich Incs [sic] Interest in the Plaintiffs' Claim in the Plaintiffs' Case (Pls.' 9/20/01 Brief) at 5.

The court now considers the legal effect of the Assignment notwithstanding its having been provided at this late juncture.[2] *See*

---

1. Without further explanation for the delay in filing the alleged assignment, plaintiffs simply stated during a status conference:

 [W]hen you [the court] wrote your opinion ... [y]ou said that the Court would not have a problem if there was an assumption to assign. ... That's what I'm trying to lay out to you right now. And then I want to submit ... the proper documentation and—and the amendment to do that.

 Transcript of September 4, 2001 Status Conference at 9–10.

2. By leave of court, plaintiffs filed a certification with the Clerk of the Court on December 27, 2001, "declar[ing] ... under penalty of perjury that the document titled 'Assignment and Assumption Agreement' dated March 8, 1994 and filed with the Clerk of the Court on September 20, 2001 is true and correct." Plaintiffs' certification of the Assignment and Assumption Agreement conforms with the requirements of 28 U.S.C. § 1746 for unsworn statements signed under penalty of perjury. Accordingly, the court will rely on plaintiffs' Assignment and Assumption Agreement as evidence in considering defen-

*Kelley v. Sec'y, U.S. Dept. of Labor*, 812 F.2d 1378, 1380 (Fed.Cir.1987) (stating that "leniency with respect to mere formalities should be extended to a pro se party").

## II. Effect of the Assignment

The Assignment provides in pertinent part that "Star International Ostrich Inc. (in formation) ... does hereby sell, hypothecate, transfer, and assign to Mr. Ricardo J. Page ... and Mr. Paul E. Fenske ... all its rights, beneficial interests, holdings, assets, and liabilities, as listed per exhibit (A) attached." Pls.' 9/20/01 Brief at 5. Listed first on the attached exhibit of seven items is the Lease executed by Star and its landlord Petelle. *Id.* Together with the Assignment, plaintiffs filed a brief explaining that the fourth paragraph of Plaintiffs' Affirmation of February 2001 contained a misstatement. *Id.* at 2. The fourth paragraph of Plaintiffs' Affirmation of February 2001 read:

> In 1997 a settlement was reached under which we, as individuals, and shareholders paid money for a dismissal. The corporation then assigned all of its assets to us for this payment.

*Id.* (quoting Plaintiffs' Affirmation of February 2001). Plaintiffs state that the paragraph should have read:

> In 1997 a settlement was reached under which we, as individuals, and shareholders paid money for a dismissal. The corporation then made payment which was generated by the plaintiff's [sic] via a ratification of an *Assignment and Assumption Agreement between SIO [Star] and plaintiffs' [sic] as of the date of 3-8-1994.*

Pls.' 9/20/01 Brief at 2. Plaintiffs state that, because they assumed Star's liabilities before

their takings claim arose on September 14, 1994 as a result of a regulatory change, they are the proper parties in interest in this action. *Id.* at 2, 3. Plaintiffs argue that the Assignment of Claims Act does not bar their claim.[3] *Id.* at 3. The Assignment of Claims Act is set forth at 31 U.S.C. § 3727 (1983). The Assignment of Claims Act governs and requires certain procedural formalities to effect the assignment of claim against the government. The court addressed the statutory requirements of the Assignment of Claims Act in some detail in its Opinion and Order dated June 8, 2001. *See Page*, 49 Fed.Cl. at 529–31.

The court now considers whether plaintiffs' Assignment avoids the Assignment of Claims Act. The court notes as an initial matter that leasehold interests may be assignable. Under the law of private corporations, it is well established that a corporation that has leased property belonging to another may transfer the lease, with the consent of the lessor, in the same manner as an individual. 7 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 2989 (1997). It is also established that the shareholders of a corporation "may render themselves personally liable for debts of the corporation by express agreement" if the agreement is supported by adequate consideration and is in writing in accordance with the statute of frauds. 13 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 6219 (1995).

Here, defendant challenges the effectiveness of the Assignment on the ground that the express language of the Lease prohibits a tenant from executing an assignment of its leasehold interest without first obtaining the

---

dant's motion to dismiss or, in the alternative, for summary judgment. *See, e.g., Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.*, 982 F.2d 686, 689–690 (1st Cir.1993)("Under federal law, an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment.").

**3.** This motion is being filed by the plaintiff's [sic] before this court for its consideration to allow the plaintiffs to represent themselves, as pro se. The claims Act, 31 U.S.C. 3727, clearly states that a corporation must be represented by an attorney authorized by the court of claims. Like-

wise the Act is clear in that if the plaintiff is not a corporation, but individual, they can represent themselves, as pro se. Furthermore, under the Claims Act, 'If an assignment of all of the beneficial interest and holdings, is originated prior to the date of claim, which ... in this case is September 14, 1994, per the government and this court's contention, is after a considerable time after the assignment which in this case, occurred in March of 1994. *Therefore the plaintiffs being misters Fenske and Page are in fact standing properly before this court*[.]'

Pls.' 9/20/01 Brief at 3.

landlord's prior written consent.[4] Defendant's Response to Plaintiffs' "Amendment to the Amendment of 4–12–2001, to Plaintiffs' Reply to the Defendents' [sic] Reply of February 21, 2001, Response Regarding Star International Ostrich Incs [sic] Interest in the Plaintiffs' Claim in the Plaintiffs' Case" (Def.'s Resp. to Pls.' 9/20/01 Brief) at 2. Defendant argues that "[p]laintiffs have failed to provide evidence that Star obtained the required written consent from Petelle Industrial Real Estate prior to Star's attempted assignment of its lease to Messrs. Page and Fenske on March 8, 1994." *Id.* Defendant adds that "[e]ven if Star had obtained permission from Petelle Industrial Real Estate to assign its lease, paragraph X states further that '[n]o permitted assignment … shall relieve Tenant of Tenant's covenants and agreements hereunder and Tenant shall continue to be liable as a principal and not as a guarantor or surety, to the same extent as though no assignment or subletting had been made.'" *Id.* at 2–3 (quoting paragraph X of the Lease).

The court looks to the state law of Illinois for guidance regarding the effectiveness of the Assignment under the terms of the Lease. Illinois state law provides that "restrictions against the assignment of a lease are intended solely for the benefit of the lessor." *Bolingbrook Equity I Limited Partnership v. Zayre of Illinois, Inc.,* 252 Ill.App.3d 753, 766, 191 Ill.Dec. 909, 624 N.E.2d 1287 (1993) (citing *Kaybill Corp. v. Cherne,* 24 Ill.App.3d 309, 319, 320 N.E.2d 598 (1974)). A bar against assignment contained in a lease is, however, not absolute in operation. Illinois state law also provides that "[i]n the instance where a tenant has attempted to assign a lease in contravention to its terms, the assignment is not void, but merely voidable by the landlord and, if the landlord does not elect to treat the leasehold as void, the requirements of the lease regarding assignment are deemed waived." *Id.*

(citing *Woods v. North Pier Terminal Co.,* 131 Ill.App.3d 21, 23–24, 86 Ill.Dec. 354, 475 N.E.2d 568 (1985)). These authorities do not, however, deal with whether the assignment is effective as between assignor and assignee.

Whether the alleged assignment by Star to Messrs. Page and Fenske in fact contravened the express terms of the Lease is unclear. As defendant has noted, plaintiffs have not produced any evidence indicating that the landlord consented to the Assignment in conformance with the lease terms.[5] *See* Def.'s Resp. to Pls.' 9/20/01 Brief at 2.

Plaintiffs state, by way of explanation of the genesis of the Assignment, that it made the Assignment to address a concern of APHIS that the entire ostrich quarantine business be in plaintiffs' control:

> The plaintiffs intentionally created, executed, and signed an Assignment and Assumption Agreement on March 8, 1994, so as to secure without any doubt as to having full control of the beneficial interest, holdings, assets and liabilities of [Star]. *This action was adhered to by the plaintiffs because of an initial question raised by USDA as to whether or not [Star] and the plaintiff had complete ownership and control of everything inclusive of the total operation.* The plaintiff, upon legal advice, did so enter into an Assignment and Assumption so as to safe guard [sic] our personal interest. Plaintiffs took full responsibility for any and all liabilities they created but not any liabilities created by former owners.

Pls.' 9/20/01 Brief at 2 (emphasis added). Plaintiffs do not press the possible implications of the point that the Assignment was made at least in part in response to defendant's concerns. Those implications appear to the court to favor recognition of the validity of the assignment vis-a-vis defendant. In these circumstances, the court treats Messrs.

---

4. Defendant specifically cites paragraph X of the Lease which provides that "[t]enant shall not, without Landlord's prior written consent, (a) assign, convey or mortgage this Lease or any interest under it." Def.'s Resp. to Pls.' 9/20/01 Brief at 2.

5. While the court is mindful of the challenges presented to pro se plaintiffs attempting to comply with the court's procedural requirements, the court observes that plaintiffs have had a long period of time within which to produce evidence pertaining to the alleged assignment of lease liability from Star to Messrs. Page and Fenske.

Page and Fenske as the proper parties to prosecute this action under RCFC 17.

### III. Motion to Dismiss

The court turns now to address plaintiffs' substantive takings claim, which was fully briefed prior to the issuance of the court's Order and Opinion of June 8, 2001.

Defendant has moved to dismiss, or alternatively, for summary judgment on plaintiffs' takings claims. For the following reasons, defendant's motion to dismiss is DENIED, and defendant's motion for summary judgment is GRANTED.

Defendant moves to dismiss plaintiffs' complaint pursuant to Rule 12(b)(4) of the Court of Federal Claims (RCFC), which provides for dismissal based on the "failure to state a claim upon which relief can be granted." RCFC 12(b)(4). Defendant asserts that plaintiffs have failed to state a legal claim here because plaintiffs have alleged that the action of APHIS constituted an "unauthorized taking." Defendant's Motion to Dismiss or in the Alternative, for Summary Judgment (Def.'s Mot.) at 10–11.

The law provides that "takings result only from authorized acts of government officials." *Thune v. United States*, 41 Fed.Cl. 49, 52 (1998) (citing *Earnest v. United States*, 33 Fed.Cl. 341, 344 (1995)). *See also Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802–03 (Fed.Cir.1993)(To bring a takings claim under the Tucker Act, a claimant "must concede the validity of the government action."). In moving for dismissal in this case, defendant relies upon plaintiffs' statement that "[a]s a result of Defendant's unauthorized taking of an interest in Plaintiffs' property, a right has accrued to Plaintiffs for the recovery from Defendant of just compensation for the interest taken from the date the taking was effectuated, October 14, 1994." [6] Compl. ¶ XI. Defendant points to this language in the complaint as evidence that plaintiffs "dispute the very authority of APHIS to enact the regulation at issue." Def.'s Mot. at 11.

The Supreme Court has held that when evaluating a motion to dismiss "for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *See also Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *LaMirage, Inc. v. United States*, 44 Fed.Cl. 192, 196 (1999). The court must presume that undisputed factual allegations in the complaint are true. *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988); *LaMirage, Inc.*, 44 Fed.Cl. at 196. However, "[t]he court will not accept as true allegations that are contradicted by facts ... or by other allegations or exhibits attached to or incorporated in the pleading." *Thune v. United States*, 41 Fed.Cl. 49, 51 (1998) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1350 at 220–21 (2d ed.1990)).

Plaintiffs state in their complaint that defendant implemented a regulation change establishing a square footage per chick requirement for ostrich quarantine operators. *See* Compl. at ¶ VI. Plaintiffs complain that the implementation of the regulation permanently and substantially interfered with their business interests and thereby effected a taking of their property. *Id.* at ¶ X. Plaintiffs state that the alleged taking of their property was "unconstitutional" and "unauthorized." *See id.* ¶¶ I, XI. However, viewed as a whole and construed "favorably to the pleader," the allegations of the complaint appear, in fact, to challenge the agency's failure to compensate plaintiffs for the impact of the regulations rather than to challenge the lawfulness of the agency's rulemaking.[7] *See Scheuer,*

---

6. The complaint which was filed by Messrs. Page and Fenske refers to themselves rather than the corporate entity Star as the plaintiffs.

7. The court's reading of the pleadings is further informed by the guidance of the Supreme Court that allegations made in a pro se complaint are to be held to " 'less stringent standards than formal pleadings drafted by lawyers.' " *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). *See also Robinson v. United States*, 2000 WL 158487, at *1 (Fed.Cir. Feb. 11, 2000) (unpublished opinion) (same); *Robles v. Sec'y of*

416 U.S. at 236, 94 S.Ct. 1683. Accordingly, the court declines to find that plaintiffs' use of the terms "unconstitutional" and "unauthorized" renders its takings claim facially defective. *See Thune,* 41 Fed.Cl. at 52 ("[P]laintiff's use of the terms 'unconstitutional' and 'unauthorized' is not fatal to his taking claim because the complaint as a whole plainly asserts that his property loss is traceable to authorized government action."). Defendant's motion to dismiss is DENIED.

## IV. Motion for Summary Judgment

Defendant alternatively moves for summary judgment pursuant to RCFC 56(c). Defendant asserts that plaintiffs did not possess a compensable property interest under the law. Def.'s Mot. at 14–23. Defendant further argues that even if a compensable property interest exists, no taking occurred. *Id.* at 23–32. The court addresses each of defendant's contentions in turn after a review of the facts of the case.

### A. Background

Four months prior to the execution of the Lease between Star and Petelle Real Estate, APHIS published a proposed rule in the Federal Register addressing quarantine facilities for birds. *See* Quarantine Facilities for Birds, 58 Fed.Reg. 41,204–01 (proposed Aug. 3, 1993) (to be codified at 9 C.F.R. pt. 93).[8] The proposed rule revised the standards for incubator/hatcher areas and bird holding areas in quarantine facilities for hatching eggs of ratites.[9] *Id.;* Def.'s Mot. at 3. The declared purpose of the proposed rule was to "protect U.S. birds and poultry from disease without requiring importers of hatching eggs of ratites to comply with the more stringent standards appropriate for imported birds." Quarantine Facilities for Birds, 58 Fed.Reg. at 41,204. APHIS solicited comments to the proposed rule and stated that all comments received before October 4, 1993 would be considered. *Id.* Further, the agency encouraged public inspection of any received comments. *Id.*

The proposed rule emphasized the expected impact of the rule change on the ostrich egg quarantine industry, stating that "entities involved in the hatching egg industry concentrate on ostrich eggs; we therefore expect the proposed rule to affect primarily the ostrich egg industry." *Id.* at 41,206; Def.'s Mot. at 4. The proposed rule also addressed the "poor success rate of imported hatching eggs," noting that "no more than 14.2 percent" of the ratite hatching eggs imported into the United States since 1991 had been released as live chicks. Quarantine Facilities for Birds, 58 Fed.Reg. at 41,206. APHIS explained that "[t]he proposed regulations would incorporate a number of miscellaneous editorial changes occasioned by the [proposed] substantive changes." *Id.*

The period for commenting on the proposed rule ended on October 4, 1993. *Id.* at 41,204. During the sixty-day comment period, APHIS received 214 comments on the proposed rule. Quarantine Facilities for Birds, 59 Fed.Reg. 47,063, 47,063 (Sept. 14, 1994) (codified at 9 C.F.R. pt. 93).

On December 17, 1993, sixty days after the conclusion of the comment period, Star entered into the Lease. The property, located in Bensenville, Illinois, had previously been in use as an ostrich quarantine facility. Compl. ¶ III. On January 19, 1994, slightly more than a month after leasing property "for purposes of operating an ostrich quarantine station," plaintiff filed an "Application

*Health and Human Services,* 1998 WL 228174, at *3 (Fed.Cir. May 7, 1998) (unpublished opinion) (same). Additionally, although plaintiffs challenge the rationale for the regulatory changes affecting ostrich quarantine facilities, they have acknowledged that "the rule in question was in fact enacted though [sic] the proper legal channels." *See* Plaintiff's Response to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment (Pls.' Resp.) at 9.

8. The rule was originally proposed to be codified and was codified at 9 C.F.R. pt. 92. In 1997, however, part 92 of Title 9 of the Code of Federal Regulations was redesignated as part 93. *See* Importation of Animals and Animal Products, 62 Fed.Reg. 56000, 56012 (Oct. 28, 1997). For simplicity and convenient reference, this opinion refers to all codifications as "pt. 93," the current codification.

9. A ratite is defined as a flightless bird "having a flat breastbone without the keellike prominence characteristic of most flying birds." American Heritage Dictionary 1452 (4th ed.2000).

for Approval of Quarantine Facility for Birds" with APHIS. Compl. ¶ III; Appendix to Def.'s Mot. (Def.'s Mot.App.) at 9. A "Quarantine Facility Inspection Report" dated January 21, 1994 indicates the approval of plaintiff's application. Def.'s Mot.App. at 14–15. In August 1994, Star imported 1,200 African ostrich eggs and quarantined them at the Bensenville facility. Compl. ¶ V.

On September 14, 1994, approximately eight months after approving Star's application to operate an ostrich quarantine facility, APHIS published the final rule relating to Quarantine Facilities for Birds in the Federal Register. *See* Quarantine Facilities for Birds, 59 Fed.Reg. 47,063 (Sept. 14, 1994) (codified at 9 C.F.R. pt. 93). In the "Supplementary Information" section of the final rule under the heading "Disease Risk," the agency observed that "a small number of commentators expressed concern that the high mortality rate for imported ostrich eggs might be disease-related." *Id.* at 47,065. Agreeing with commentators that "adequate space is necessary for the health of the hatched chicks," the agency explained that "[b]ased on our experience enforcing the regulations, we consider 75 percent to be the maximum percentage of eggs likely to hatch in a lot, and 10 square feet to be the minimum amount of space necessary per hatched chick." *Id.* at 47,066. Accordingly, as codified at 9 C.F.R. § 93.106(c)(2)(ii)(O) (1999), the rule required that the bird holding area in quarantine facilities "shall be of a size large enough to accommodate 75 percent of the incubator capacity, with a minimum of 10 square feet per egg." Quarantine Facilities for Birds, 9 C.F.R. § 93.106(c)(2)(ii)(O) (1999). The final rule became effective on October 14, 1994. 59 Fed.Reg. at 47,063.

By letter dated January 18, 1995, APHIS notified Mr. Page that, based upon the square footage of their facility, the maximum number of eggs that Star could import for one quarantine period was 497 eggs. Compl. ¶ VII; Def.'s Mot.App. at 6. "[T]o ease possible inconveniences resulting from this requirement," the agency offered two

accommodations. Def.'s Mot.App. at 6. One accommodation permitted the importation of one quarantined lot of eggs after the effective date of the rule (but before February 1, 1995) under the space requirements that were in place before the regulation change.[10] *Id.* Star did not avail itself of that offered accommodation. *Id.* at 7.

Messrs. Page and Fenske filed suit in this court on July 6, 1999. Plaintiffs allege that they obtained financing to import ostrich eggs with an expectation of quarantining the eggs in accordance with the January 21, 1994 approval and then hatching the eggs for commercial sale. *See* Compl. at ¶ V. Plaintiffs further allege that the 1994 regulatory change imposing a square footage requirement per egg in a quarantine facility substantially reduced the number of ostrich eggs that plaintiff could import. *See* Compl. ¶ VIII. Plaintiffs complain that due to the regulatory change, "investors backed out of their relationship with Plaintiffs." *Id.* Asserting that the regulation has effected "a permanent and substantial interference with [their] leasehold and business," plaintiffs seek compensation for a taking in violation of the Fifth Amendment of the United States Constitution. Compl. ¶ X.

In its motion for summary judgment, defendant asserts that plaintiffs did not possess a compensable property interest with which the agency's action interfered. Def.'s Mot. at 12–23. Defendant also argues that even if a compensable property interest existed, no taking occurred. *Id.* at 23–32.

**B. Standard of Review**

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. United States Court of Federal Claims Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson*, 477 U.S. at

10. The other accommodation permitted the importation of supplemental shipments "to replace infertile eggs removed by candling, thereby, bringing incubated egg totals to the maximum specified in the regulation within the 15 day period after arrival of the first shipment of a specific quarantined lot." Def.'s Mot.App. at 6.

248, 106 S.Ct. 2505. A movant is entitled to summary judgment if the nonmovant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in favor of the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. That a case "is a takings case does not affect the availability of summary judgment when appropriate to the circumstances." *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996).

### C. Examination of Taking Claim

#### 1. Factors in a regulatory taking

 A regulatory taking may occur when a governmental action affects and limits the use to which an owner may put his property. *See Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 2457, 150 L.Ed.2d 592 (2001); *Cienega Gardens v. United States,* 265 F.3d 1237, 1244 (Fed.Cir. 2001). The first step in the court's analysis is to "determine what was taken." *Branch v. United States,* 69 F.3d 1571, 1575 (Fed.Cir. 1995). In making that determination, the court must consider whether "the use interest proscribed by the governmental action" was part of the bundle of property rights acquired by the owner. *M & J Coal Co. v. U.S.,* 47 F.3d 1148, 1154 (Fed.Cir.1995). The claimant in a takings action bears the responsibility for establishing a compensable property interest. *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir. 1993); *Avenal v. United States,* 33 Fed.Cl. at 785.

 If the claimant can establish the existence of a compensable property interest, the court must determine whether the governmental action at issue constituted a taking. *M & J Coal Co.,* 47 F.3d at 1154. In assessing whether a regulatory taking has occurred, the court must perform a three-part analysis of the character of the government action, the economic impact of that action, and the reasonableness of the property owner's investment-backed expectations. *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124–125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The Supreme Court has stated that the force of one of the three factors may be "so overwhelming ... that it disposes of the taking question." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

#### 2. Identifying plaintiffs' property interest

Plaintiffs' complaint and briefing include various allegations as to the affected property interest for which they seek compensation in this case. Plaintiffs allege "a permanent and substantial interference with [their] leasehold and business." Compl. ¶ X. Plaintiffs also allege that "any expectation which arose on Plaintiff[s'] part as a result of the government approving the square footage of its facility constituted a property right." Pls.' Resp. at 11–12. Plaintiffs "contend that a restriction based on square footage of one's own property which cause [sic] one's business to end and also one's leasehold is a taking of a compensable property interest." Pls.' Resp. at 11.

The court understands the gravamen of plaintiffs' complaint to be that the 1994 regulatory change which affected ratite quarantine facility space requirements frustrated plaintiffs' business plan. Plaintiffs' expectation of success under a business plan based on a permit issued prior to the 1994 regulation appears to be the property interest for which they seek compensation.

#### 3. Is the property interest compensable?

Defendant argues that plaintiffs' "expectation to be free from the amendment to [9 C.F.R. § 93.106(c)(2)(ii)(O) ], specifically the minimum space requirements [for ostrich quarantine facilities]" is not a compensable property right. Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment (Def.'s Rep.) at 6–7. In defendant's view, plaintiffs had no compensable property interest in their leasehold interest because the lease for the quarantine facility was executed after the proposed regulatory change and after partial implementation of

the new rules affecting ostrich quarantine facilities.[11] Def.'s Mot. at 13.

As support for its position, defendant cites the Federal Circuit's decision in *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed.Cir.1993). Defendant contends that this particular case "speaks directly to the questions presented by Mr. Page and Mr. Fenske in the present case." Def.'s Mot. at 19–20.

The plaintiff in *Mitchell Arms* (Mitchell) was a federally-licensed firearms importer involved in the commercial sale of firearms to wholesalers and retailers. *Mitchell Arms*, 7 F.3d at 213. Pursuant to the "sporting purposes" exception to the Gun Control Act, 18 U.S.C. §§ 921–930 (1988), plaintiff obtained from the Bureau of Alcohol, Tobacco, and Firearms (ATF) permits authorizing the importation of a specific type and quantity of firearms. *Mitchell Arms*, 7 F.3d at 213–14. Each import permit was valid for six months. *Id.* at 214.

Mitchell had imported rifles for two years under ATF permits when ATF announced the suspension of pending import permit applications while the "sporting purposes" of the imported arms were evaluated. *Id.* at 214. After receiving notice of the suspended application process, Mitchell completed certain financial arrangements for the importation of more firearms. *Id.* Nine months after ATF first announced the permit suspension and following a comment period inviting the views of interested parties, ATF issued a final decision banning further importation of assault weapons and revoking previously issued import permits. *Id.* "[T]o alleviate the hardship resulting from the revocation of existing permits," ATF advised Mitchell of other commercial uses for the banned arms and suggested modifying the rifles to meet new import criteria. *Id.* The Mitchell plaintiff modified and disposed of half of its imported inventory, *id.*, then filed suit in the Court of Federal Claims alleging that suspension and revocation of its import permits constituted a compensable taking. *Id.* at 215. The trial court concluded that neither

the permits themselves nor Mitchell's expectations arising from the combination of the permits and its contract to import arms amounted to a property interest within the meaning of the Just Compensation Clause of the Fifth Amendment. *Id.* The Federal Circuit affirmed. *Id.* at 217.

The Federal Circuit agreed with the government that the plaintiff in *Mitchell Arms* "had not asserted the kind of property right that could be the subject of a taking claim." *Id.* at 213. Mitchell asserted that "a property interest was created when it agreed to purchase the assault rifles with an expectation of importing them under the issued permits." *Id.* at 215. The Federal Circuit observed that "Mitchell asks us to hold that its investment-backed reliance on the issued import permits constituted 'property' within the meaning of the Fifth Amendment. We decline to do so." *Id.*

Relying on *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the Federal Circuit observed that "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Mitchell Arms*, 7 F.3d at 216. The Federal Circuit reasoned that because the *Mitchell Arms* plaintiff "voluntarily entered the firearms import business, thereby knowingly placing itself in the governmentally controlled arena of firearms importation under the Gun Control Act," the expectation of selling assault rifles could not be deemed a property right under the Fifth Amendment. *Id.*

Plaintiffs in this case assert that defendant's reliance on *Mitchell Arms* is misplaced and attempt to distinguish their claim. Focusing on the Federal Circuit's statement that "one of the most valuable characteristics of the bundle of rights commonly called 'property' is 'the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government,'" *id.* at 215, plaintiffs state,

**11.** Defendant's argument relies on the reasoning that because APHIS initiated a regulatory change before plaintiffs signed their lease agreement,

plaintiffs' anticipated property use was never acquired as part of the plaintiffs' bundle of rights. *See id.* at 12–13.

"Surely, the Plaintiffs have the right to sole and exclusive possession and the right to exclude ... the Government, from their own property." Pls.' Resp. at 11. The court, however, does not agree that plaintiffs have any compensable "right to exclude strangers, or for that matter friends, but especially the Government" in these circumstances.

Plaintiffs here cannot "exclude ... the Government" from their business. Their business is a creature of government regulation of public health and welfare. Bird importation and quarantining is heavily regulated by the government to protect U.S. birds and poultry from disease. *See* 21 U.S.C. § 134c (1999) (authorizing the Secretary of the Department of Agriculture to promulgate regulations "regulating the movement into the United States of any animals which ... would ... be likely to introduce or disseminate any ... [communicable] disease"). In May 1990, APHIS issued a proposed rule to amend the regulations then in 9 C.F.R. part 92 governing the importation of animals and animal products to allow, under carefully defined conditions, the importation of ratites and hatching eggs of ratites. *See* Importation of Ostriches and Other Ratites, 55 Fed. Reg. 21,879, 21,879 (proposed May 30, 1990). The final rule issued on July 12, 1991. *See* Importation of Ostriches and Other Ratites, 56 Fed.Reg. 31,858 (Jul. 12, 1991) (codified at 9 C.F.R. pt. 93).

The subsequent enactment in 1992 of the Wild Bird Conservation Act, 16 U.S.C. §§ 4901–4916 (1992), which sharply limited the number of birds importable into the United States, permitted APHIS to increase the number of quarantine facilities for imported birds based upon the higher number of available personnel to provide bird importation-related services. *See* Quarantine Facilities for Birds, 58 Fed.Reg. at 41,204. Accordingly, to encourage and "enable all qualified persons interested in operating bird quarantine facilities to do so," APHIS proposed a rule in August 1993 that "would allow importers access to privately-owned quarantine facilities nationwide" rather than limiting the number of "approved" quarantine facilities. *Id.* The proposed rule included regulations that specify "standards, and handling procedures, for incubator/hatcher areas and chick holding areas in privately owned quarantine facilities for hatching eggs of ratites." *Id.* The proposed rule specifically stated:

> Hatching eggs of ostriches and other ratities are unaffected by the Wild Bird Conservation Act of 1992. Therefore, potential importers of these eggs are likely to benefit from easier access to privately operated quarantine facilities. *Our records indicate that entities involved in the hatching egg industry concentrate on ostrich eggs; we therefore expect the proposed rule to affect primarily the ostrich egg industry.* Because ratites other than hatching eggs are not allowed to be quarantined in privately operated facilities, importers of ratites other than hatching eggs would not be affected.

Quarantine Facilities for Birds, 58 Fed Reg. at 41,206 (emphasis added). APHIS invited comments to the proposed rule and, following a period of consideration, the agency issued the final rule which plaintiff now challenges as effecting a regulatory taking of its property.

Plaintiffs' claim in this case appears closely analogous to that of plaintiff in *Mitchell Arms.* Plaintiffs voluntarily entered the business of importing and quarantining ostrich eggs to be hatched with the expectation that the chicks would be sold for breeding purposes. *See* Compl. ¶ V. The business placed plaintiffs squarely in a "governmentally controlled arena," *see Mitchell Arms,* 7 F.3d at 216, and plaintiffs do not dispute that operating the ostrich quarantining facility required detailed regulatory compliance. In fact, although Star's president challenges the necessity of regulating ostriches for certain avian diseases,[12] Mr. Page states that the first set

---

12. During a status conference, Mr. Page stated that the health concerns about the spread of avian disease were not applicable to ostriches because an ostrich is not a bird but a ratite. Transcript of December 14, 1999 Status Conference (Dec.1999 Tr.) at 8–10. Explaining that the body structure of an ostrich is similar to that of a horse, Mr. Page asserted, "There has never been one case of an ostrich having Newcastle's," a highly contagious avian disease. Dec.1999 Tr. at

of imported eggs were handled in accordance with the applicable regulations, "which we did per USDA requirements, did it absolutely perfect." [13] Dec.1999 Tr. at 15.

Defendant states that plaintiffs' ability to import ostrich eggs and sell them in the United States was at all times entirely subject to the exercise of APHIS's regulatory power. Def.'s Mot. at 23. Accordingly, defendant reasons that any expectation which arose on Plaintiffs' part as a result of APHIS's approval of the square footage of plaintiffs' quarantining facility cannot constitute, under the law, a compensable property interest. Def.'s Reply at 5–6. *See Mitchell Arms*, 7 F.3d at 216.

Mere participation in a heavily regulated environment does not bar a plaintiff from any possibility of showing that it has a property interest compensable under the Fifth Amendment. *See Conti v. United States*, 48 Fed.Cl. 532, 537 (2001); *Maritrans Inc. v. United States*, 40 Fed.Cl. 790, 797–98 (1998)(finding no per se rule that one may never prevail on a takings claim if participating in a heavily regulated industry). Rather, courts must consider whether the affected "right of use" is dependent upon the regulatory scheme or whether "an independent or preexisting right of use under common law

applies." *Maritrans*, 40 Fed.Cl. at 798. *See also Lucas*, 505 U.S. at 1030, 112 S.Ct. 2886; *Mitchell Arms*, 7 F.3d at 217. Here, as in *Mitchell Arms*, the affected "right of use"—to engage in ratite egg hatching—is not inherent in any way in plaintiffs' Lease, but rather is totally dependent upon the APHIS permit. *See Mitchell Arms*, 7 F.3d at 217. Plaintiffs' alleged property interest—specifically, the approved square footage per egg of the quarantining facility and the anticipated profit under plaintiffs' business plan for that square footage per egg—does not exist independently of the government's regulatory scheme. *See Mitchell Arms*, 7 F.3d at 217; *Maritrans*, 40 Fed.Cl. at 798–99.

■ Even if a highly regulated environment would not preclude a finding of a compensable property interest in another case, the fact that plaintiffs' reliance here is based on a permit within the APHIS regulatory framework does preclude a finding of a compensable property interest in this case. This court has held that neither licenses nor permits are compensable property interests protected by the Takings Clause because they are created by the government, can be canceled by the government, and normally are not transferrable. [14] *Am. Pelagic Fishing Co. v. United States*, 49 Fed.Cl. 36, 46 (2001).

9–10. Mr. Page's observation appears to challenge the wisdom of the regulation. The issue here, of course, is not the wisdom of the APHIS regulatory scheme, but whether it effected a taking of a compensable property interest in this case.

13. Defendant adds:

Whether the plaintiffs had actual knowledge of these existing and proposed regulations and laws, or the fact that the regulations in the ratite egg importation industry had changed a number of times in a short period of time and were set to change again, is of no consequence, given the "well-established rule that a citizen is presumed to know the law, and that 'ignorance of the law will not excuse.'" *United States v. Merkt*, 764 F.2d 266, 273 (5th Cir.1985) (quoting *Lambert v. California*, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957)).

Def.'s Mot. at 18.

14. Even if plaintiffs' claimed property interest were of a type deemed compensable, plaintiffs' claim fails under the three-pronged *Penn Central* test. *See Penn Cent. Transp. Co.*, 438 U.S. at 124–125, 98 S.Ct. 2646. The challenged governmental action is a regulation intended to protect

public health and welfare. Such regulation is a traditional exercise of the government's police power and militates against finding a taking. *See, e.g., Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed.Cir.2001).

Moreover, the economic impact of the regulation does not fall disproportionately on plaintiffs. Rather, the regulation affects all involved in the ratite egg hatching business similarly. Nor does the regulation deprive plaintiffs of all economically beneficial or productive use of their property. *See, e.g., Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–1016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1365, 1367 (Fed.Cir. 2000); *McKay v. United States*, 199 F.3d 1376, 1381–82 (Fed.Cir.1999); *Fla. Rock. Indus. v. United States*, 18 F.3d 1560, 1564–65 (Fed.Cir. 1994). Rather, the regulation permit plaintiffs to use their property for the intended purpose of ratite egg hatching (albeit for fewer eggs than plaintiffs had planned) or for any other lawful purpose.

Finally, the fact that plaintiffs' property interest involved reliance on a permit in a heavily regulated industry undermines plaintiffs' claim of reasonable investment-backed expectations.

**340**

*See Bradshaw v. United States,* 47 Fed.Cl. 549, 553 (2000) ("A grazing permit ... was never intended to be a compensable property right."); *Hage v. United States,* 35 Fed.Cl. 147, 171 (1996) ("reliance on the privilege to graze ... [cannot] create a property interest.").

 Like the plaintiff in *Mitchell Arms,* plaintiffs in this case have asked the court "to hold that its investment-backed reliance on issued import permits constituted 'property' within the meaning of the Fifth Amendment." *Mitchell Arms,* 7 F.3d at 215. The court declines to do so. Instead, the court finds, as a matter of law, that the frustration of Star's financial expectations by a regulatory change requiring a particular square footage per egg in a quarantine facility does not constitute a taking of a property right protected by the Fifth Amendment. *See Connolly,* 475 U.S. at 227, 106 S.Ct. 1018; *B–West Imports,* 75 F.3d at 638; *Mitchell Arms,* 7 F.3d at 217.

## V. Conclusion

For the foregoing reasons, defendant's motion to dismiss is DENIED, and defendant's motion for summary judgment is GRANTED. The Clerk of the Court shall enter judgment for defendant. Each party shall bear its own costs.

IT IS SO ORDERED.

---

The Supreme Court instructs that a " 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.' " *Ruckelshaus,* 467 U.S. at 1006, 104 S.Ct. 2862 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). Under the law, "a mere unilateral expectation" does not constitute a property interest that is entitled to protection under the Fifth Amendment. *See Webb's Fabulous Pharmacies,* 449 U.S. at 161, 101 S.Ct. 446. In *Connolly v. Pension Benefit Guar. Corp.,* the Supreme Court stated that "[t]hose who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." 475 U.S. 211, 227, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). In *B–West Imports, Inc. v. United States,* 75 F.3d 633, 638 (Fed.Cir.1996), the Federal Circuit found that the revocation of a permit allowing an embargo exemption for arms from China was not a taking:

> While an individual who obtains a permit to import arms may make commitments in the arms market on the assumption that the permit will not be revoked before the importation is completed, that assumption does not constitute a "reasonable investment backed expectation[ ]" of the type necessary to support a takings claim.

